IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


JUAN AQUINO,
        Petitioner,

vs.                                                    Case No. 4:06cv318/SPM/EMT

WALTER A. McNEIL,
        Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 22). Respondent filed an answer to the petition with relevant portions of the state court record, and Petitioner filed a reply (Docs. 28, 29, 32).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Docs. 10, 28, Exhibits). Petitioner was originally charged in the Circuit Court in and for Leon County, Florida, with sexual battery on a child under twelve years of age by a defendant eighteen years of age or older (Doc. 28, Ex. K at 1). A jury trial was held on December 10–12, 2003, at which Petitioner was represented by retained counsel, and the proceeding ended in a mistrial (*see* Doc. 28, Ex. K at 19–21, 74, 77–78). The public defender was appointed to represent

Petitioner at the new trial (*id.* at 75). On April 8, 2004, the State filed an amended information charging Petitioner with an additional count of lewd and lascivious molestation of a child under the age of twelve years (Doc. 10, Ex. A; *see also* Doc. 28, Ex. K at 2). The amended information alleged that the act underlying the offenses occurred on June 20, 2002, when the victim was four years old (*see* Doc. 10, Ex. A, Ex. I at 29, 33). Following a jury trial on April 14–15, 2004, Petitioner was found guilty as charged (Doc. 10, Ex. C, Ex. I; Doc. 28, Ex. K at 104–05). On April 20, 2004, Petitioner was adjudicated guilty and sentenced to life imprisonment, with pre-sentence jail credit of 586 days, on the sexual battery count (Doc. 10, Ex. D, Ex. I at 597–98; Doc. 28, Ex. K at 106–14). The court declined to impose sentence on the lewd and lascivious molestation count (*id.*).

Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"). On June 14, 2005, the First DCA affirmed the judgment of conviction per curiam without written opinion, with the mandate issuing June 30, 2005 (Doc. 10, Exs. G, H). Aquino v. State, 903 So. 2d 937 (Fla. 1st DCA June 14, 2005) (Table). Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

On May 8, 2006, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 28, Ex. K at 132–278). On May 15, 2006, the post-conviction trial court denied the motion on the ground that the motion, on its face, failed to state a cause of action (*id.* at 279–80). The court granted Petitioner thirty (30) days to file an amended motion and warned Petitioner that his failure to do so would result in a bar to his seeking future relief under Rule 3.850 (*id.* at 280). The court granted Petitioner an extension of time to July 14, 2006 (*id.* at 281–83). On July 11, 2006, Petitioner filed an amended Rule 3.850 motion (*id.* at 284–324). The court denied the motion as untimely and successive (*id.* at 325–26). Petitioner appealed the decision to the First DCA, and the appellate court reversed and remanded the case for further proceedings (Doc. 28, Ex. L). Aquino v. State, 958 So. 2d 1133, 1134 (Fla. 1st DCA 2007). The trial court then summarily denied Ground One of the Rule 3.850 motion and set the other issue for an evidentiary hearing (Doc. 28, Ex. K at 346–61). Following the limited evidentiary hearing, at which Petitioner was represented by counsel, the trial court denied Ground Two of Petitioner's Rule 3.850 motion (Doc. 28, Ex. K at 377–78, Ex. M). Petitioner appealed the decision to the First DCA, and the

appellate court affirmed per curiam without written opinion on January 13, 2009, with the mandate issuing February 10, 2009 (Doc. 28, Ex. Q). <u>Aquino v. State</u>, 1 So. 3d 174 (Fla. 1st DCA Jan. 13, 2009) (Table).

While his Rule 3.850 motion was pending, Petitioner filed the instant habeas action (Doc. 1 at 6). Upon conclusion of the Rule 3.850 proceeding, Petitioner amended his petition to add the two claims raised in the Rule 3.850 proceeding (Doc. 22). Respondent concedes that the original petition and the amended petitions were timely (Doc. 28 at 9).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

(d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

---

[1] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. See Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

    A.    Ground one: "Whether the trial court erred by admitting collateral crime evidence in violation of Petitioner's constitutional rights to due process and a fair trial."

Petitioner contends the trial court violated his due process rights by admitting "Williams[2] Rule" evidence at trial (Doc. 22 at 4, 4a–4b). He contends the testimony of Jasmine Garcia and J.R., a minor, regarding Petitioner's prior sexual molestation of them, was not relevant to any matter at trial except to show Petitioner's bad character (*id.*). He further contends the probative value of this evidence was substantially outweighed by its unfairly prejudicial effect (*id.*). Therefore, the trial court's admission of such evidence rendered his trial fundamentally unfair in violation of due process.

Respondent first contends Petitioner failed to fairly present the federal nature of his claim to the state courts (Doc. 28 at 13–19). Respondent concedes that Petitioner stated in his initial brief to the First DCA on direct appeal of his conviction that admission of the Williams Rule evidence violated his right to due process and a fair trial, and Petitioner cited the Fifth and Fourteenth

---

[2]In Williams v. State, the Supreme Court of Florida held that evidence of any fact relevant to a material fact in issue, except where the sole relevancy is character or propensity of the accused, is admissible unless precluded by some specific exception or rule of exclusion, and this rule applies to relevant similar fact evidence even though it points to the commission of another crime. 110 So. 2d 654, 663 (Fla. 1959). The holding in Williams was codified in Florida Statutes Section 90.404(2), which provides in pertinent part:

> (a) Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

Fla. Stat. § 90.404(2)(a) (2001).

Effective July 1, 2001, section 90.404(2) was amended to create a new paragraph (b) allowing the admission of evidence of other crimes, wrongs, or acts of child molestation when a defendant is charged with a crime involving child molestation, and providing that such evidence may be considered for its bearing on any matter to which it is relevant:

> (b) 1. In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.
>
> 2. For the purposes of this paragraph, the term "child molestation" means conduct proscribed by s. 794.011 or s. 800.04 when committed against a person 16 years of age or younger.

Fla. Stat. § 90.404(2)(b) (2001). In McLean v. State, the Supreme Court of Florida interpreted Section 90.404(2)(b) and held that the collateral crime evidence must still be relevant to be admissible under § 90.404(2)(b), and even if admissible under § 90.404(2)(b), the collateral crime evidence is still subject to weighing under Florida Statute Section 90.403 to assess probative value versus unfair prejudice, confusion of issues, misleading the jury, and unnecessary cumulative evidence. 934 So. 2d 1248, 1259 (Fla. 2006).

Case No. 4:06cv318/SPM/EMT

Amendments; however, he never developed this argument in his brief (*id.* at 13, 18). Additionally, although Petitioner cited two federal cases in his brief, those cases concerned due process challenges to a specific federal rule of evidence, not general due process challenges to the concept of the admission of collateral crime evidence (*id.* at 13–14, 18). In addition to the exhaustion defense, Respondent contends Petitioner's claim is not subject to federal habeas review because it raises only an issue of state law, even though Petitioner couches the issue in terms of federal due process (*id.* at 19–21). Respondent's third argument against habeas relief is that even if Petitioner's claim is cognizable, he is not entitled to relief under the AEDPA because there is no United States Supreme Court case that discusses the admission of collateral crime evidence in terms of due process or fundamental fairness; therefore, the state court's adjudication of Petitioner's claim cannot be contrary to or an unreasonable application of Supreme Court precedent (*id.* at 21–22).

In his reply brief, Petitioner contends he exhausted his federal due process claim by arguing in his initial brief on direct appeal that the trial court's error in admitting the collateral crime evidence deprived him of due process and a fair trial guaranteed by the Fifth and Fourteenth Amendments because the evidence was irrelevant and tended to prove only his bad character (Doc. 32 at 4). Petitioner further states he cited two federal cases, United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001) and United States v. McHorse, 179 F.3d 889 (10th Cir. 1999) for the proposition that the trial court's admitting the evidence violated due process because the court failed to determine whether the probative value of the evidence was outweighed by the risk of unfair prejudice (*id.* at 4–5).

The state court record shows that in Petitioner's appellate brief he argued that the federal Constitution required that collateral crime evidence be relevant to be admissible, and admission of irrelevant evidence, which tended to prove only Petitioner's bad character, was unfairly prejudicial and violated his right to due process and a fair trial (Doc. 10, Ex. E at 20–23, 27). Petitioner cited provisions of the Florida constitution and statutes, as well as the Federal Rules of Evidence and the Fifth and Fourteenth Amendments to the Constitution (*id.*). The undersigned concludes that Petitioner's direct citation to specific Constitutional Amendments and his argument that the trial court's admission of the evidence violated his rights to due process and a fair trial guaranteed by the

federal Constitution fairly presented a federal due process claim to the state courts. Therefore, Petitioner satisfied the exhaustion requirement.

The state court's summary denial of this claim included no findings, so it is appropriate to conclude that the state court found no error in the trial court's admission of the collateral crime evidence because the evidence was relevant and its probative value substantially outweighed the danger of unfair prejudice, or admission of the evidence was harmless, or both. The First DCA did not specifically cite to any United States Supreme Court case for the standard to be applied in resolving Petitioner's claim. However, as previously noted, a state court is not required to cite United States Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early, 537 U.S. at 8. Although the state court denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable. See Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326–27 (11th Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

It is well established that a challenge to a state trial court's ruling on a question of state law, for example, an evidentiary ruling, is cognizable on federal habeas only to determine whether the alleged error was so critical or important to the outcome of the trial to render the trial fundamentally unfair. Carrizales v. Wainwright, 699 F.2d 1053, 1053–54 (11th Cir. 1983). Such review is available under the Due Process Clause. See Hills v. Henderson, 529 F.2d 397, 401 n.6 (5th Cir. 1976). "The established standard of fundamental fairness [when reviewing state evidentiary rulings] is that habeas relief will be granted only if the state trial error was 'material in the sense of a crucial, critical, highly significant factor.'" Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983) (quoting Hills, 529 F.2d at 401). In this context, the Eleventh Circuit has reviewed a claim similar to the claim presented here. See Tejada v. Dugger, 941 F.2d 1551, 1561 (11th Cir. 1991). In Tejada, the petitioner claimed that the admission of Williams Rule evidence, specifically, testimony that the petitioner had once put a pillowcase over his girlfriend's head, tied her up, and threatened to kill her, rendered his trial fundamentally unfair because it only served the purpose of convincing the jury that

he had a propensity to commit violent crimes. *Id.* The Eleventh Circuit expressed no opinion on the propriety of the trial court's admission of the evidence, holding that regardless of that question, the admission of the evidence did not deprive the petitioner of a fundamentally fair trial. *Id.* The court based this conclusion upon the determination that the challenged evidence was not "material" to the conviction "in the sense of a crucial, critical, highly selective factor" because the State presented far more powerful evidence of his guilt through other testimony. *Id.* (citing <u>Shaw</u>, *supra*).

Since <u>Tejada</u>, the legal landscape has changed with the passage of the AEDPA. As previously discussed in the Standard of Review section of this Report and Recommendation, the AEDPA brought about a more deferential standard for habeas review of state court decisions under § 2254. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002). Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's constitutional claim. *See* <u>Panetti</u>, 551 U.S. 930; <u>Jones</u>, 469 F.3d 1216 (same).

In <u>Williams v. Taylor</u>, the Supreme Court addressed the "clearly established law" requirement of § 2254(d)(1) before turning to the "contrary to, or an unreasonable application of," requirement. 529 U.S. 362, 379. The <u>Williams</u> Court highlighted the importance of the clause immediately following the "clearly established law" requirement, "limiting the area of relevant law to that 'determined by the Supreme Court of the United States.'" *Id.* at 381 (quoting 28 U.S.C. § 2254(d)(1)). The Court then held that "[i]f this Court has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish

such a principle with clarity sufficient to satisfy the AEDPA bar." *Id.* In <u>Lockyer v. Andrade</u>, the Supreme Court subsequently held that the "clearly established law" requirement "refers to holdings, as opposed to dicta, of [the] . . . Court's decisions as of the time of the relevant state-court decision." 538 U.S. at 71 (quoting <u>Williams</u>, 529 U.S. at 412).

The Eleventh Circuit has held that the "clearly established law" requirement of § 2254(d)(1) does not include the law of the lower federal courts. *See* <u>Dombrowski v. Mingo</u>, 543 F.3d 1270, 1274 (11th Cir. 2008) (citing <u>Putman v. Head</u>, 268 F.3d 1223, 1241 (11th Cir. 2001)). Moreover, when no Supreme Court precedent is on point, the Eleventh Circuit has held that a state court's conclusion cannot be "contrary to clearly established Federal law as determined by the U.S. Supreme Court." *Id.* (quoting <u>Washington v. Crosby</u>, 324 F.3d 1263, 1265 (11th Cir. 2003)). In <u>Dombrowski</u>, the habeas petitioner claimed that the Florida state sentencing court violated his Fifth Amendment right against self-incrimination by failing to advise him of this right before soliciting his admission to prior convictions for sentencing enhancement purposes. *Id.* at 1273. Dombrowski argued that the Supreme Court's decision in <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), was clearly established federal law guaranteeing his Fifth Amendment right not to testify at his sentencing hearing about his prior convictions. *Id.* at 1274. Although the district court agreed that <u>Miranda</u> afforded Dombrowski such a right, the Eleventh Circuit was not persuaded and concluded that there is no clearly established federal law requiring sentencing courts to either determine that a defendant knows and understands the consequences of his admission to prior convictions for sentence enhancement purposes or to advise a defendant of his Fifth Amendment rights before hearing such an admission. *Id.* at 1276. Thus, the court adhered to its previous decisions in <u>Washington v. Crosby</u> and <u>Isaacs v. Head</u>, in which the court held that "where no Supreme Court precedent is on point, we cannot say that the state court's conclusion . . . is contrary to clearly established Federal law as determined by the U.S. Supreme Court." *Id.* (citing <u>Isaacs</u>, 300 F.3d 1232, 1252 (11th Cir. 2002); <u>Washington</u>, 324 F.3d at 1265).[3]

---

[3]In so deciding, the Eleventh Circuit stated that it was "mindful of the Supreme Court's reminder that 'rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule.'" <u>Dombrowski</u>, 543 F.3d at 1276 (citing <u>Williams</u>, 529 U.S. at 382). However, the court was convinced that Dombrowski's Fifth Amendment argument did not rise to the level of a generalized standard, let alone

Notably, another District Judge in this District recently denied habeas relief on a claim identical to Petitioner's claim. *See* <u>Quintero v. McNeil</u>, No. 4:08cv318/RH/MD (N.D. Fla. June 23, 2009) (opinion attached). In <u>Quintero</u>, the habeas petitioner was charged with sexual battery on a single child victim. *Id.* The state trial court admitted evidence not only that Quintero committed sexual batteries on the single victim but that he also committed repeated sexual batteries years earlier on another child victim. *Id.* Quintero asserted in his § 2254 petition that the admission of this other-act evidence was unconstitutional. *Id.* The District Judge treated the issue as sufficiently raised on Quintero's direct appeal of his conviction and, thus, not procedurally defaulted. *Id.* The District Judge then denied relief on the ground there was no clearly established federal law as determined by the Supreme Court suggesting that the admission of "other-act" evidence in the case at bar was unconstitutional. *Id.*

The undersigned concludes that Petitioner is not entitled to relief for the same reason. Initially, the <u>Williams</u> Rule evidence, that is, the testimony of Jasmine Garcia and J.R., was relevant. At Petitioner's trial, the State presented testimony from Rosalind Vega, the mother of A.V., the victim of the crimes with which Petitioner was charged (Doc. 10, Ex. I at 29). Ms. Vega testified that Efrain Maldonado is her stepfather, and he and his "common law wife" Carmen moved from New York to Tallahassee, Florida in the spring of 2002 (*id.* at 29–31). Ms. Vega testified that she met Petitioner, who is Carmen's son, when he helped Mr. Maldonado and Carmen move to Florida (*id.* at 31–32). She further testified that on June 20, 2002, Petitioner and his girlfriend, Lilly, and their children arrived in Tallahassee from New York (*id.* at 32). Ms. Vega testified that the same day, June 20, she took two of her children, A.V. and J.V., to the trailer park where Mr. Maldonado lived so she could drive him and Carmen to get license tags for their car (*id.* at 33–35). A.V. was four and a half years old at the time (*id.* at 33). Ms. Vega testified that Carmen suggested she leave A.V. and J.V. at the trailer with Petitioner, Lilly, and the other kids so the children would be

---

a bright-line rule. *Id.* The court noted the wide disparity in opinion among its sister circuits on this issue and the lack of Supreme Court precedent directly on point. *Id.* The court also noted the Supreme Court's explanation in <u>Williams</u> that "[w]here the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Id.* (quoting <u>Williams</u>, 529 U.S. at 382) (internal quotation and citation omitted). The Eleventh Circuit was satisfied, however, that such a case was not before it. *Id.*

entertained instead of being bored at the tag office (*id.* at 36). She testified that when she left, Petitioner, Lilly, and all of the children were in Mr. Maldonado's trailer (*id.* at 37). She, Carmen, and Mr. Maldonado went to the tag office, then picked up Christian, another of Ms. Vega's children, and then returned to the trailer park (*id.*). When she returned, she, Petitioner, Lilly, and A.V. were standing in a small porch area of Petitioner's trailer, and A.V. said, "Mommy, I have to tell you something" (*id.* at 39–41). A.V. then whispered to her mother, "Mommy, Johnny licked me, licked my toti" (*id.* at 41). Ms. Vega testified that "toti" means vagina or private area (*id.* at 44). Petitioner immediately handed A.V. a dollar and said he had promised her earlier that he would give her a dollar for candy (*id.* at 42–43). Ms. Vega testified that A.V. did not have a dollar when they arrived at the trailer park (*id.* at 42). Ms. Vega then gathered her children into her car and left the trailer park (*id.* at 43). When she and the children arrived home, she took A.V. into a room and asked her what had happened, and A.V. related that while she and Petitioner were in the bathroom, Petitioner pulled down her pants and licked her (*id.* at 44). She also relayed that Petitioner was naked and asked her to sit in his lap, but she told him no and told him to put his clothes back on (*id.*). Ms. Vega testified that A.V. relayed all of these events although not in that sequence (*id.*). She testified that she then contacted the police (*id.*).

The State also presented testimony of the victim, A.V., who was six years old at the time of trial (*id.* at 71). She identified Petitioner as the man whom she knows as "Johnny" (*id.* at 74). A.V. testified that in June of 2002, she and her mother and brothers went to Carmen's trailer (*id.* at 74–75). She testified that her mother left her at Carmen's trailer, and while her mom was gone, she and Petitioner went to Petitioner's trailer (*id.* at 75–76). She testified that she and Petitioner went into the bathroom of the trailer, and Petitioner took her pants down (*id.* at 76–78). A.V. testified that Petitioner touched her in her "middle," and she pointed to where he touched her (*id.* at 79). When asked what he touched her with, she pointed to her tongue (*id.* at 79– 80). She further testified that while they were in the bathroom, she saw Petitioner naked and she told him that she did not want to sit on him (*id.* at 80). She testified that Petitioner put his clothes on, and they left the bathroom (*id.* at 80–81). A.V. testified that Petitioner gave her a dollar after her mom left, and then he took her to the other trailer, and that is when she left to go home (*id.* at 82–83).

The State then presented the testimony of Jasmine Garcia and J.R., which is the <u>Williams</u> Rule evidence challenged by Petitioner. Jasmine Garcia testified that the first time she and Petitioner had sex, she was nearly thirteen years old (*id.* at 187–89). She testified that she and her family were moving to a new apartment, and she was alone in her parents' apartment waiting for the furniture company to arrive (*id.* at 188). She testified that Petitioner came into the apartment to get some boxes, and as he was leaving, he turned around and raped her on the floor by the door (*id.* at 188–90). She testified that she did not agree to have sex with him this first time, and she told him to stop (*id.* at 192). She stated that during the rape, Petitioner told her not to say anything to anyone because they would not believe her (*id.* at 189). Jasmine further testified that she and Petitioner had sex approximately five or six times over the next several months (*id.* at 192). She stated she saw him quite often during that period, that he would wait near her bus stop for her to leave for school in the morning and drive her to school, and he would wait for her after school and they would sit in his van and talk (*id.* at 193–94). She testified that she "cut school" to be with Petitioner, but she "had no choice" because Petitioner told her to do it, and she was young and afraid of what he might say or do to her (*id.* at 199, 203). Jasmine further testified that her Aunt Hilda and Petitioner were dating during this time, but when her Aunt Hilda found out that she and Petitioner were having sex, Hilda was not angry because Jasmine told her that she did not want to have sex, but Petitioner forced her (*id.* at 201–02). She testified that she never wanted to have sex with Petitioner, and she never initiated sex (*id.* at 203).

J.R., Jasmine's sister, testified that she was born August 23, 1989, and was fourteen years old (*id.* at 209). She testified that she knew Petitioner because he was her aunt's former boyfriend (*id.*). J.R. testified that when she was six years old, Petitioner put his private part in her rear, and she started screaming (*id.* at 210, 213). She testified that this incident occurred in her aunt's bedroom at her grandmother's house when she and her cousins and her brother were watching a movie (*id.* at 210). J.R. testified that she, her cousins, her brother, and Petitioner were under the covers of the bed, and the lights were off (*id.* at 210–11). She stated that Petitioner was next to her under the covers and put his private part in her rear end (*id.* at 211). She testified that she screamed and went to the bathroom, and she saw that she was bleeding (*id.*). She testified that she told her mother she

was bleeding, but she did not tell her what Petitioner did (*id.* at 211–12). J.R. testified that on another occasion, she and her father went to her grandmother's house, and Petitioner, Petitioner's cousin, and other children were there (*id.* at 212). She testified that Petitioner sent the other kids to bed, but he would not allow her to go with them (*id.* at 212–13). Petitioner then started touching her private parts with his hands (*id.*). She testified that Petitioner masturbated on her stomach and then licked the ejaculate off her stomach (*id.* at 212, 222). She testified that they both had their clothes on, but her shirt was pulled up (*id.* at 212). J.R. testified that she and Petitioner were in the living room, and her father and Petitioner's cousin were in another room (*id.* at 213).

The evidence that Petitioner sexually molested Jasmine, a thirteen year old girl, and J.R., a six or seven year old girl, five years prior to the sexual molestation of A.V., the four year old female victim in this case, lent credibility to A.V.'s allegations and was probative of the issue of Petitioner's intent, as well as his plan, scheme or design in that it showed that Petitioner sexually molested pre-teen, inexperienced girls, vulnerable to unbelievability and easy intimidation or bribery, in a familial-like setting, when the girls were in Petitioner's unsupervised custody and Petitioner had the opportunity to molest them.

Petitioner has pointed to no Supreme Court precedent holding that the admission of relevant evidence, even evidence of a defendant's other crimes or bad acts, violates the Due Process Clause,[4] and, just as the District Judge determined in Quintero, the undersigned has found none.[5] Therefore,

---

[4]Although Petitioner cited United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001) and United States v. McHorse, 179 F.3d 889 (10th Cir. 1999) in his brief to the First DCA and in his reply to Respondent's answer in the instant case, those cases are not decisions of the United States Supreme Court.

[5]In Lisenba v. People of State of California, the defendant challenged on due process grounds the state trial judge's admission of live snakes at trial on the ground that the sole purpose of the production of the snakes was to prejudice the jury against him, and those in the courtroom, including the jury, were in a panic as a result of the snakes being brought into the courtroom. 314 U.S. 219, 228, 62 S. Ct. 280, 86 L. Ed. 166 (1941). Noting that "[the Court] do[es] not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence," the Supreme Court held that the fact that evidence admitted as relevant by a trial court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process. 314 U.S. at 228–29.

In Estelle v. McGuire, the Supreme Court held that McGuire's due process rights were not violated during his prosecution for second degree murder of his infant daughter by the admission of evidence that the infant suffered from battered child syndrome because evidence of the victim's prior injuries was relevant to issue of intent. 502 U.S. 62, 70, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). The Court expressly declined to address the issue of whether the admission

the First DCA's rejection of Petitioner's due process claim was not contrary to, and did not involve an unreasonable application of, clearly established federal law as determined by the Supreme Court. Moreover, the state court decision was not based on an unreasonable determination of the facts. Therefore, Petitioner is not entitled to federal habeas relief on this claim. *See, e.g.,* Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (denying federal habeas relief on petitioner's claim that admission of propensity evidence, that is, evidence of past uncharged sexual offenses, to lend credibility to victim's allegations of assault and kidnapping violated due process, on ground that petitioner pointed to no Supreme Court precedent establishing that admission of propensity evidence necessarily violates due process); Bugh v. Mitchell, 329 F.3d 496, 512–13 (6th Cir. 2003) (state court's admission of "other acts" evidence was not contrary to clearly established Supreme Court precedent, inasmuch as "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts

---

of irrelevant evidence violates the due process guaranteed by the Fourteenth Amendment. 502 U.S. at 70 (citing Spencer v. Texas, 385 U.S. 554, 563–64, 87 S. Ct. 648, 17 L. Ed. 2d 606 (1967) (rejecting argument that Due Process Clause requires exclusion of prejudicial evidence, even though limiting instructions were given and a valid state purpose was served, and recognizing, "Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. . . . But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure.")).

In Dowling v. United States, the Supreme Court rejected a due process challenge to the admission of testimony regarding collateral crime evidence. 493 U.S. 342, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990). During Dowling's trial for bank robbery, the Government presented testimony of Vena Henry, who testified that a man wearing a knitted mask with cutout eyes and carrying a small handgun had, together with a man named Delroy Christian, entered her home approximately two weeks after a bank robbery in the town where she lived. 493 U.S. at 344. Ms. Henry testified that a struggle ensued, and she unmasked the intruder, whom she identified as Dowling. *Id.* at 344–45. Based on this incident, Dowling had been charged under Virgin Islands law with burglary, attempted robbery, assault, and weapons offenses, but had been acquitted after a trial held prior to the federal trial on federal bank robbery and armed robbery charges. *Id.* at 345. The Supreme Court held that where the collateral crime testimony was "at least circumstantially valuable in proving [Dowling's] guilt," the admission of this testimony did not violate the Due Process Clause. *Id.* at 353. In so holding, the Court rejected Dowling's argument that admission of evidence relating to acquitted conduct is inherently unreliable, as well as his argument that the use of this type of evidence creates a constitutionally unacceptable risk that the jury will convict the defendant on the basis of inferences drawn from the acquitted conduct. *Id.*

Moreover, while the Supreme Court has addressed whether prior acts evidence is permissible under the Federal Rules of Evidence, *see* Old Chief v. United States, 519 U.S. 172 (1997), Huddleston v. United States, 485 U.S. 681 (1988), the Court has not explicitly addressed admission of such evidence in constitutional terms.

In none of the Supreme Court cases discussed *supra* did the Supreme Court hold that the admission of relevant evidence, including collateral crime evidence, violates a defendant's due process rights under the Fourteenth Amendment.

evidence"); *see also* <u>Torres v. Runnels</u>, 137 Fed. Appx. 96, 2005 WL 1507572 (9th Cir. 2005) (unpublished) ("Because there is no United States Supreme Court precedent holding that admission of evidence of prior sexual misconduct to show propensity violates due process, the state court's determination in this case cannot be contrary to or an unreasonable application of clearly established federal law and Torres is not entitled to habeas relief."); <u>Lamarca v. Secretary</u>, No. 8:06-cv-1158-T-17MSS, 2008 WL 3983124, at **28, 31 (M.D. Fla. Aug. 26, 2008) (unpublished) (federal habeas petitioner was not entitled to relief on claim that trial court violated due process in admitting collateral crime evidence where petitioner failed to cite any clearly established Supreme Court precedent which suggested, much less established, that state court's analysis contravened, or was unreasonable under, clearly established Supreme Court precedent), *certificate of appealability denied*, 568 F.3d 929 (11th Cir. 2009).[6] *But see* <u>Thornburg v. Mullin</u>, 422 F.3d 1113, 1124 (10th Cir. 2005) (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 75 (1991) as clearly established Supreme Court law applicable to claim that trial court's erroneous admission of evidence violated due process and describing <u>Estelle</u> standard as whether introduction of challenged evidence "so infused the trial with unfairness as to deny due process of law.").

> B.    <u>Ground Two: "Ineffective assistance of counsel for failure to procure the attendance of reverse Williams' Rule evidence, Detective Sandra Rubino, and call her at trial for exculpatory and impeachment evidence."</u>

Petitioner contends he received ineffective assistance of counsel because defense counsel failed to present testimony of Detective Sandra Rubino at trial (Doc. 1 at 4, 4c–4o). Petitioner states Detective Rubino's testimony could have been used to impeach the testimony of Jasmine Garcia, the victim of Petitioner's previous conviction in the State of New York for rape, that Petitioner forcibly raped her because Rubino would have testified that Jasmine considered herself and Petitioner in a relationship, Jasmine voluntarily skipped school to meet Petitioner, Petitioner did not forcibly rape Jasmine, and the only reason Petitioner was charged with raping her was the fact that Jasmine was under the age of 18 (*id.* at 4c–4h). Petitioner further states Detective Rubino's testimony could have been used to impeach the testimony of Hilda Oquendo, the aunt of Jasmine and J.R., that she did not

---

[6]The undersigned cites <u>Torres</u> and <u>Lamarca</u> only as persuasive authority and recognizes that the opinions are not considered binding precedent.

initiate the criminal complaint against Petitioner concerning J.R., and her testimony that the reason Petitioner was not charged with sex acts involving J.R. was that J.R. was too young to testify (*id.* at 4h–4m). Petitioner contends he was prejudiced by defense counsel's failure to call Detective Rubino as a witness because the evidence against him was tenuous, his first trial had ended in a mistrial, and Detective Rubino's testimony would have cast doubt upon Petitioner's guilt by showing the true circumstances surrounding the allegations involving Jasmine Garcia and J.R., that is, that his relationship with Jasmine was consensual, and there was no evidence of sexual acts with J.R. (*id.* at 4m–4o).

    1.  Clearly Established Federal Law

  The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's

actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. 690–91. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Id. at 691. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. Id. "One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior" to a legal proceeding. Lawhorn v. Allen, 519 F.3d 1272, 1295 (11th Cir. 2008) (quoting Magill v. Dugger, 824 F.2d 879, 886 (11th Cir. 1987)). Such preparation includes an understanding of the legal procedures and the legal significance of tactical decisions within those proceedings. Young v. Zant, 677 F.2d 792, 794, 799-800 (11th Cir. 1982) (an attorney's reliance on former law and unawareness of procedure deprived his client of effective assistance). Tactical or strategic decisions based on a misunderstanding of the law are unreasonable. Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003); see also Horton v. Zant, 941 F.2d 1449, 1462, 1463 (11th Cir.1991) (counsel's "tactical decision" to present no mitigating evidence during the sentencing phase was "unreasonable" when it was based on a misinterpretation of the law and the failure to evaluate alternative paths); Jackson

v. Herring, 42 F.3d 1350, 1367–68 (11th Cir. 1995) (counsel's strategic decision was not reasonable as it was "unsupported by sufficient investigation" and information "of the available options").

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. Chandler, 218 F.3d at 1314 n.14 (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518-19 (11th Cir. 1995) (en banc)). "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Waters, 46 F.3d at 1514. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).[7]

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground One in his amended Rule 3.850 motion (Doc. 28, Ex. K at 4–9). In the state court's written opinion denying Petitioner's Rule 3.850 motion, the state court identified the Strickland standard as the controlling legal standard for analyzing claims of ineffective assistance of counsel (Doc. 28, Ex. K at 347). Because the state court correctly identified Strickland as the governing precedent, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable determination of the facts or that the state court decision was an unreasonable application of Strickland.

a.      Impeachment of Jasmine Garcia's testimony

With regard to Petitioner's contention that Detective Rubino's testimony would have impeached the testimony of Jasmine Garcia, the state court found as fact that at Petitioner's first trial, Detective Rubino testified regarding her investigations of other sexual assault cases against Petitioner in the State of New York (see Doc. 28, Ex. K at 347). The court found that Detective Rubino did not definitively testify that Jasmine's encounters with Petitioner were consensual; rather, Rubino testified that Jasmine told her both that "she went along with it," and that she was "coerced." (id.). The court also found that on cross-examination, Detective Rubino had difficulty recalling

---

[7]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

details about J.R.'s investigation and concluded that she never spoke to that victim (*id.*). The court further found that on re-cross examination, Detective Rubino repeatedly stated that she had seen cases where children graphically described details of penetration, but no physical signs of penetration were found upon medical examination weeks or months later (*id.*). Based upon these findings, the state court concluded that Petitioner failed to show how presenting Detective Rubino's testimony at the second trial would have changed the outcome (*id.*).

Petitioner contends that the post-conviction court's factual findings were unreasonable. Petitioner states the following testimony by Detective Rubino in the first trial rebuts the court's finding that Detective Rubino did not definitively testify that her interviews revealed consensual encounters:

Q [by the prosecutor]: Did you speak with Jasmine Garcia about the relationship as well?

A [by Detective Rubino]: Yes.

Q. Did she consider them [Jasmine and Petitioner] in a relationship?

A. She considered it some type of relationship, yes.

Q. Did she ever tell you that she agreed to have sex with the defendant?

A. She did have—she did agree to have sex with him, yes.

Q. The first time or after that?

A. According to my interviews, there was no physical force involved.

Q. What do you mean by that?

A. In New York City, the way—physical force is threats or physical force, meaning pushing, shoving, or hitting in order to force sex upon a person.

According to Jasmine, and her being thirteen years old, she articulated to me that even though she felt it was wrong, she did have sex with him.

Q. Okay. Did she tell you how it happened the first time?

     A.     The first time happened in the first week on or about June of 1996 when he, Mr. Aquino, was helping her move into an apartment in Lower Manhattan. And that's where the first sexual encounter took place.

     Q.     Did she tell you that she wanted the sexual encounter to take place?

     A.     She didn't use those words exactly. What she informed me was she went along with it.

     Q.     She was coerced into it?

     A.     Yes.

     Q.     She would have been how old in June of 1996:

     A.     I believe she was thirteen.

. . . .

     Q [by defense counsel]: At any time that you spoke with Jasmine was there any mention of any gun, that he threatened her with a gun?

     A.     No.

. . . .

     Q.     Did you hear through your investigation or by your investigation on your own find that . . . Jasmine would skip school and go meet Juan?

     A.     Yes.

     Q.     Did your investigation show that?

     A.     Yes.

     Q.     And that was on her own?

     A.     Yes.

. . . .

     Q.     [The prosecutor] asked you something about if it was by force. But, in the charging document, he was never charged, was he, with forcibly raping Jasmine?

     A.     No.

> Q.      . . . the charge is because he was over the age of 18 and she was under the age of 18, is it not?

> A.      Correct.

> Q.      And because of that, there can be no consent, because of age, is that—

> A.      Right.

> Q.      And that's why he was charged?

> A.      Yes.

(Doc. 22 at 4d–4e; Doc. 28, Ex. R at 117–18, 119, 122–23).

To determine the impeachment value, if any, of Detective Rubino's testimony, the court must review Jasmine Garcia's testimony at Petitioner's second trial.[8]  Ms. Garcia testified that the first time she and Petitioner had sex, she was nearly thirteen years old (*id.* at 187–89).  She testified that she and her family were moving to a new apartment, and she was alone in her parents' apartment waiting for the furniture company to arrive (*id.* at 188).  She testified that Petitioner came into the apartment to get some boxes, and as he was leaving, he turned around and raped her on the floor by the door (*id.* at 188–90).  She testified that she did not agree to have sex with him this first time, and she told him to stop (*id.* at 192).  She stated that during the rape, Petitioner told her not to say anything to anyone because they would not believe her (*id.* at 189).  Jasmine further testified that she and Petitioner had sex approximately five or six times over the next several months (*id.* at 192).  She stated she saw him quite often during that period, that he would wait near her bus stop for her to leave for school in the morning and drive her to school, and he would wait for her after school and they would sit in his van and talk (*id.* at 193–94).  She testified that she "cut school" to be with Petitioner, but she "had no choice" because Petitioner told her to do it, and she was young and afraid of what he might say or do to her (*id.* at 199, 203).  Jasmine further testified that her Aunt Hilda and Petitioner were dating during this time, but when her Aunt Hilda found out that she and Petitioner were having sex, Hilda was not angry because Jasmine told her that she did not want to have sex,

---

[8]Although Jasmine Garcia's testimony was previously summarized, the summary will be repeated in the interest of readability of this Report and Recommendation.

but Petitioner forced her (*id.* at 201–02). She testified that she never wanted to have sex with Petitioner, and she never initiated sex (*id.* at 203).

Initially, the state court's finding that Detective Rubino did not definitively testify that her interviews with Jasmine Garcia revealed consensual encounters was not unreasonable. Detective Rubino testified that Jasmine stated, with regard to her first encounter with Petitioner, that she "went along with it," but she was "coerced."[9] With regard to subsequent encounters, Rubino's testimony revealed that Jasmine agreed to have sex with Petitioner, and Petitioner did not use physical force or threats of physical force during the sexual encounters, but Jasmine was too young to consent to the sexual contact. Based upon this testimony, it was not unreasonable for the state court to make a factual finding that Detective Rubino did not definitively testify that her interviews revealed consensual encounters.

Additionally, Detective Rubino's testimony had little impeachment value with regard to Jasmine Garcia's testimony. Detective Rubino's testimony that Jasmine "went along with" but was "coerced" into the first sexual encounter when she (Jasmine) was under the age of consent did not call into question the credibility of Jasmine's testimony that during this first sexual encounter, she did not agree to have sex with Petitioner and she told him to stop, but he raped her. Furthermore, Detective Rubino's testimony that Jasmine agreed to subsequent sexual encounters, and Petitioner did not use physical force or threats of physical force during these encounters, was not inconsistent with Jasmine's testimony because Jasmine never testified that she did not agree to the subsequent encounters, nor did she testify that Petitioner used physical force or threats of physical force during these encounters. Additionally, Detective Rubino's testimony regarding the nature of Petitioner's criminal charge in New York for the sexual encounters with Jasmine Garcia would not have impeached Jasmine's testimony. Detective Rubino testified that Petitioner was prosecuted for rape in New York not because he forcibly raped Jasmine but because Jasmine was under the age of 18, and Petitioner was over the age of 18. This testimony would not have discredited Jasmine's affirmative response to the two-part question, "He was prosecuted for his relationship with you in

---

[9] By definition, "coerce" means "to restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 439 (2002).

New York; right? He was prosecuted for forcing you to have sex with him?" (Doc. 10, Ex. I at 194). First, it is unclear whether Jasmine's affirmative answer refers to the first part of the question or the second part of the question or both, which makes the testimony difficult to impeach. To the extent her answer was in response to the first part of the question, Rubino's testimony has no impeachment value whatsoever because Petitioner was indeed prosecuted for having a sexual relationship with Jasmine, who was under the age of 18 at the time of the relationship. To the extent her answer was in response to the second part of the question (or both), Rubino's testimony would have had minimal—if any—impeachment value. Consistent with Jasmine's testimony at Petitioner's trial that her first encounter was forced, Rubino testified that Jasmine told her the encounter was coerced. Although Rubino also stated that Jasmine told her she "went along with" the first encounter, such testimony would have done little to detract from Jasmine's statements on two occasions that the first encounter was coerced. Moreover, as noted *supra*, even though later encounters were not coerced, there is no inconsistency between Jasmine's testimony at Petitioner's trial and Rubino's earlier testimony in this regard. Furthermore, through cross-examination of Jasmine, defense counsel presented facts from which the jury could infer that Petitioner was prosecuted for raping Jasmine not because he used physical force during their sexual encounters, but because she was under the age of 18 and he was over the age of 18 when the encounters occurred. Lastly, calling Rubino as a witness at Petitioner's trial would have bolstered Jasmine's testimony that Petitioner had previously engaged in a repetitive sexual relationship with a thirteen-year-old female child. Regardless of whether the prior relationship was consensual, the evidence would serve only to emphasize Petitioner's sexual proclivity toward young girls. Therefore, counsel's failure to present Detective Rubino's testimony to impeach Jasmine Garcia's testimony was not unreasonable.

b.    Impeachment of Hilda Oquendo's testimony

With regard to Petitioner's contention that Detective Rubino's testimony would have impeached the testimony of Hilda Oquendo, the state court found as fact that during Petitioner's first trial, the court ruled that testimony regarding whether Ms. Oquendo initiated a criminal complaint against Petitioner in New York was irrelevant (*id.* at 348). Therefore, the post-conviction court

concluded, defense counsel was not ineffective for failing to present testimony that was previously determined irrelevant (*id.*).

Although Petitioner is correct in his contention that the state court made an incorrect factual determination that the judge ruled in Petitioner's first trial that testimony regarding whether Ms. Oquendo initiated a criminal complaint against Petitioner in New York was irrelevant (the judge actually ruled that testimony regarding whether Ms. Oquendo was ever sexually abused when she was young was irrelevant (*see* Doc. 28, Ex. R at 61–62)), this incorrect factual finding did not render unreasonable the state court's decision that Petitioner failed to satisfy the <u>Strickland</u> standard with regard to defense counsel's failure to call Detective Rubino as a witness to impeach Ms. Oquendo's testimony, as Petitioner has failed to show that Detective Rubino's testimony had any impeachment value with regard to Ms. Oquendo's testimony.  Petitioner contends Detective Rubino's testimony could have been used to impeach Ms. Oquendo's testimony that she did not initiate the criminal investigation of Petitioner regarding allegations that he had sexual contact with J.R., as well as Ms. Oquendo's testimony that the reason Petitioner was not charged with sex acts involving J.R. was that J.R. was too young to testify (Doc. 22 at 4h–4m).

Hilda Oquendo testified that she had a relationship with Petitioner from 1990 to February of 1997, and he was the father of her daughter (Doc. 10, Ex. I at 159–60).  She testified that Jasmine Garcia and J.R. are her nieces (*id.* at 160).  Ms. Oquendo testified that the day after her relationship with Petitioner ended, she took her children to St. Vincent's hospital to be examined, and the hospital reported allegations of sexual abuse perpetrated by Petitioner to police because the laws of New York required hospital staff to contact police if a person tells them that a child has been abused (*id.* at 166).  Ms. Oquendo testified that J.R. was also taken to the hospital and examined, but she was not the person who took her to the hospital (*id.* at 168).  Ms. Oquendo testified that the police contacted her about sexual abuse allegations concerning Jasmine and J.R. (*id.* at 163, 166).  She also testified that J.R. was six years old at the time, and charges were not filed against Petitioner concerning sexual molestation of J.R. because the prosecutor decided J.R. was too young to testify (*id.* at 168–69).

Detective Rubino testified that in 1997, she investigated a report that J.R. was molested by Petitioner, and that J.R.'s last contact with Petitioner was in December of 1996 (Doc. 28, Ex. R at 119–20, 127). Detective Rubino testified that J.R. was examined by Dr. Brown on March 11, 1997, and if Dr. Brown had found physical indications of vaginal or anal penetration, such information would have been included in her (Rubino's) report (*id.* at 120–21, 127). Detective Rubino testified that her report did not include any information that Dr. Brown found physical evidence of sexual abuse, therefore, Petitioner was not charged with any crime of which J.R. was the victim (*id.* at 121–22). Detective Rubino further testified that the New York Police Department had a policy that criminal charges were not filed in such cases if the victim was under seven years of age and there was no corroborating physical evidence or eyewitness report (*id.* at 128). Detective Rubino also testified that in her experience as an investigator of sexual abuse allegations involving children, she would not expect there to be physical indications of sexual abuse three months after it occurred (*id.* at 127–28). She further testified that she investigated cases where the child victim graphically articulated penetration but there were no physical indications of penetration when the child was examined two or three months later (*id.* at 129–31).

Petitioner overstates the impeachment value of Detective Rubino's testimony with regard to Hilda Oquendo. Even if Detective Rubino would have testified as Petitioner suggests, that is, that Rubino's report stated,

> On 3/10/97 the U/S received a phone call from Hilda Oquendo stating that she has a niece, [J.R.], f/H/7, that states that Juan, the subject in this case, put his thing on her back and made her bleed.

(*see* Doc. 22 at 4k–4l), this testimony would not have impeached Ms. Oquendo's testimony that the criminal investigation was initiated by a report from hospital personnel, but she (Oquendo) admittedly spoke with police regarding the allegations that Petitioner molested J.R. and Jasmine Garcia. Moreover, through Hilda Oquendo's testimony on direct and cross-examination, the jury was presented facts showing that the sexual abuse allegations concerning J.R. and Jasmine Garcia surfaced immediately after Ms. Oquendo and Petitioner broke off their long-term relationship due to a disagreement, and Petitioner was not criminally charged regarding the allegations involving J.R. (*see* Doc. 10, Ex. I at 160–63, 165–66, 168–69), thus creating an inference that the allegations were

motivated by Ms. Oquendo's ill will toward Petitioner. Therefore, counsel's failure to present Detective Rubino's testimony on this point was not unreasonable.

Petitioner also contends Detective Rubino's testimony would have impeached Hilda Oquendo's testimony that criminal charges were not pursued against Petitioner for the alleged sexual molestation of J.R. because J.R. was too young to testify. Petitioner states Detective Rubino would have testified that the reason charges were not filed was there was no credible evidence that Petitioner engaged in the alleged conduct (Doc. 22 at 4l–4m). However, through J.R.'s testimony on direct and cross-examination, as well as Hilda Oquendo's testimony on cross-examination, the jury was presented facts showing that J.R. discussed her allegations with police in 1997 (Doc. 10, Ex. I at 168–69, 213–14, 220–21), thus creating an inference that the only evidence that Petitioner sexually molested J.R. was J.R.'s allegations,[10] and the New York prosecutor did not pursue criminal charges against Petitioner based upon those allegations. Therefore, counsel's failure to present Detective Rubino's testimony on this point was not unreasonable.

Petitioner has failed to show that defense counsel's failure to present Detective Rubino's testimony at trial was a decision that no competent counsel would have made. Accordingly, the state court's decision denying Petitioner's claim under <u>Strickland</u> was not unreasonable.

    C.    <u>Ground three: "Ineffective assistance of counsel for failure to secure the Petitioner's constitutional right to a speedy trial."</u>

Petitioner contends defense counsel at his second trial should have asserted Petitioner's right to a speedy trial when his first trial ended in a mistrial on December 12, 2003; thereby requiring that he be brought to trial within ninety (90) days (Doc. 22 at 5, 5a–5c). Petitioner contends even though Ms. Whisnant, the attorney who represented him at his second trial, was not appointed to represent him until after the mistrial, Ms. Whisnant did not perform any additional investigation in preparation for trial, rather, she simply reviewed the transcript of the first trial and the discovery material obtained by Petitioner's prior counsel (*id.* at 5a). Petitioner further contends that his former counsel's acquiescing to the State's motion for a continuance of the trial date from November to

---

[10]Moreover, neither J.R. nor Ms. Oquendo testified at Petitioner's trial that J.R. exhibited physical signs of sexual abuse.

December of 2003 did not constitute a waiver of Petitioner's right to a speedy trial, and Ms. Whisnant could have filed a notice of expiration of speedy trial after the 90-day period expired, on March 12, 2004 (*id.* at 5b). Petitioner contends he was prejudiced by counsel's failure to invoke his right to a speedy trial because on April 8, 2004, the State amended the information to add the lewd and lascivious molestation count, which caused the jury to believe that Petitioner engaged in multiple sex acts involving the alleged victim (*id.* at 5b–5c)

        1.      Clearly Established Federal Law

The clearly established Supreme Court precedent governing claims of ineffective assistance of counsel is set forth *supra* in Ground Two.

        2.      Federal Review of State Court Decision

Petitioner raised this ineffective assistance of counsel claim as Ground Two in his amended Rule 3.850 motion (Doc. 28, Ex. K at 10–12). As previously noted, the state court identified the Strickland standard as the controlling legal standard for analyzing claims of ineffective assistance of counsel (Doc. 28, Ex. K at 347, 377). Because the state court correctly identified Strickland as the governing precedent, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable determination of the facts or that the state court decision was an unreasonable application of Strickland.

The state court found as fact that Ms. Whisnant was a very experienced criminal defense attorney, and that her testimony at the evidentiary hearing was credible (Doc. 28, Ex. K at 377). The court noted that Petitioner's case was a capital sexual battery case with a mandatory life sentence at stake, and the case involved at least two Williams Rule issues in addition to the other issues routine to a serious case, and the court found that Ms. Whisnant made a strategic decision to schedule the second trial in mid-April (*id.*). The court further found that Petitioner's first counsel waived Petitioner's speedy trial right, and that waiver bound Ms. Whisnant (*id.* at 378). The court determined that the only way for Ms. Whisnant to reinstate Petitioner's speedy trial period to was file a demand for speedy trail, in which case the trial would have been set within 5–45 days from the filing of the demand, and which required a good faith representation from counsel that she was ready for trial prior to mid-April, but Ms. Whisnant could not make such a representation (*id.*). Based

upon these findings, the court concluded that defense counsel did not perform deficiently by failing to assert Petitioner's speedy trial right (*id.*).

The state court additionally concluded that Petitioner failed to demonstrate he was prejudiced by counsel's alleged error (*id.*). Petitioner alleged he was prejudiced because the additional time permitted the State to file an amended information adding the lewd and lascivious molestation count, Count Two. However, the court did not impose a sentence on Petitioner's conviction of Count Two (*id.*). Furthermore, even if Petitioner's retrial had occurred within a week of the mistrial, there was no evidence that the prosecutor would not have filed the amended information prior to the new trial date, as the amendment simply added an alternative offense under the same facts as Count One (*id.*).

Because the trial court made the factual finding that counsel's speedy trail decision was a strategic one, it is presumed to be tactical but must be evaluated as to whether it was a reasonable choice. The state court record shows that on December 12, 2003, the trial court appointed the public defender's office to represent Petitioner at retrial (*see* Doc. 28, Ex. K at 76), and Ms. Whisnant testified that she was notified on December 16 that she was assigned to the case (Doc. 28, Ex. M at 9–10). Ms. Whisnant testified that she had been practicing law since 1979 (twenty-five years at the time of Petitioner's trial in 2004), and she spent all but five of those years practicing in the area of criminal defense (*id.* at 3). She testified that according to the case docket, on December 17, 2003, the trial was set for April 12, 2004 (*id.* at 10).[11] Ms. Whisnant testified that she was aware that when a mistrial occurs, a defendant must be re-tried within 90 days of the mistrial (*id.* at 11–12). She further testified that her agreement to the April 12 trial date was a strategic decision (*id.* at 5–6), and she required the time from December 16, 2003 to April 12, 2004 to properly prepare for trial because it was a capital sexual battery case with two <u>Williams</u> Rule witnesses from the State of New York, and Petitioner's case was not the only case she was handling during that time (*id.* at 5–7, 13–14, 17).

In light of the severity of the charge in Petitioner's case, the complexity of the evidentiary issues, Ms. Whisnant's experience as a criminal defense lawyer, and her handling of other cases in addition to Petitioner's during that time, Ms. Whisnant's decision to set the trial date four months

---

[11] The state court record includes a transcript of the December 17, 2003, hearing during which the trial was set for April 12, 2004 (Doc. 28, Ex. K at 369–72).

after Petitioner's mistrial and the court's appointing her to represent him was not unreasonable; indeed, other competent counsel would have made the same decision.  Therefore, Petitioner has failed to demonstrate that the state court's denial of this claim was based upon an unreasonable determination of the facts or contrary to or an unreasonable application of <u>Strickland</u>.

Accordingly, it is respectfully **RECOMMENDED**:

That the amended petition for writ of habeas corpus (Doc. 22) be **DENIED**.

At Pensacola, Florida, this 17<u>th</u> day of July 2009.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**